912 F.2d 463
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Lloyd BAKER, Plaintiff-Appellee,
v.
MECKLENBURG COUNTY, NORTH CAROLINA, Gerald G. Fox,
individually and as county manager, Louis Joe Strickland,
individually and as personnel director, J. Harry Weatherly,
Jr., individually and as finance officer, Defendants-Appellants,
and
Nathan E. Alberty, Defendant.
 No. 88-2097.
 United States Court of Appeals, Fourth Circuit.
 Argued March 8, 1990.
Decided Aug. 27, 1990.
Rehearing and Rehearing In Banc Denied Sept. 27, 1990.
 
 Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. James B. McMillan, Senior District Judge. (CA-86-232-C-C-M)
 James Orr Cobb, Jr., Ruff, Bond, Cobb, Wade & McNair, Charlotte, N.C., for appellants.
 Michael Anthony Sheely, Charlotte, N.C., (argued), for appellee; Shelly Blum, Charlotte, North Carolina, on brief.
 W.D.N.C.
 REVERSED.
 Before ERVIN, Chief Judge, and K.K. HALL and WILKINS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Mecklenburg County, Gerald G. Fox, Louie Joe Strickland, and J. Harry Weatherly appeal from a jury verdict which found them guilty of violating Lloyd Baker's first amendment rights. The jury awarded Baker $27,400 in damages after finding that the various defendants discriminated against him in making employment decisions because he told the County Manager and the District Attorney that his supervisor was misusing County funds. After thoroughly reviewing the record and hearing oral argument we reverse the judgment of the lower court because there is insufficient evidence that the employment decisions were made in retaliation against Baker because of his statements about the misuse of County funds.
 
 I.
 
 2
 Lloyd Baker was Accounting Manager in the Mecklenburg County Finance Department under Finance Director Nathan Alberty from 1976 until 1982. In July 1982 Alberty announced his decision to reorganize the department. He split it into two units--"Finance and Administration" and "Operations." Alberty placed Baker at the head of Operations and selected Harry Weatherly, formerly Baker's subordinate, to manage the Finance and Administration unit. Before the reorganization, Weatherly reported to Baker. After the reorganization Weatherly reported directly to Alberty, Baker was given fewer responsibilities, and Baker was instructed to report to Weatherly in Alberty's absence.
 
 
 3
 Baker complained about the reorganization. He spoke to Strickland, the County Personnel Director, to Fox, the County Manager, and to Alberty himself about it. The main topic of these meetings was Alberty's authority to reorganize the department. However, Baker also told Fox about what he thought were financial improprieties on the part of Alberty. Baker claimed that Alberty had used County employees for outside business activities. Baker first learned of these alleged improprieties in May of 1980. The first time he mentioned them to anyone was in a July 1982 meeting with Fox. Because Fox did not act on the matter, Baker met with District Attorney Peter Gilchrist to discuss Alberty's alleged misuse of funds in August 1982.
 
 
 4
 In November 1982, the District Attorney talked to Fox about conducting a criminal investigation of Alberty in connection with a matter unrelated to Baker's complaints. As part of the investigation, Gilchrist asked Baker to meet with a State Bureau of Investigation agent. This meeting took place in April 1983. The subject of the meeting was Baker's knowledge, if any, of alleged kickbacks received by Alberty in connection with computer contracts. Baker had no knowledge of any such kickbacks.
 
 
 5
 In 1983 County Manager Fox recommended that the Board of County Commissioners terminate Alberty's position as Finance Director. On Fox's recommendation, the Board chose Weatherly for the position of acting Finance Director.[1]
 
 
 6
 During a meeting of the Finance Department in June of 1983, Fox made an announcement that Alberty had been placed on leave. Fox also stated that there had been a departmental leak to the news media from the finance office. Baker commented that he was being blamed for the leak because he had gone to the District Attorney in 1982. Weatherly was present at this meeting; however, Strickland was not a Finance Department employee and did not attend the meeting.
 
 
 7
 Baker filed suit against Mecklenburg County, Fox, Strickland, Weatherly and Alberty claiming that they retaliated against him because he told Fox and Gilchrist that Alberty was misusing County funds. Specifically, Baker claimed that: (1) Fox submitted only Weatherly's name to the Board of Commissioners as a candidate for acting Finance Director, (2) Weatherly lowered Baker's performance ratings as a result of his statements, (3) Weatherly failed to support him as a manager and reduced his responsibilities from 1984 through 1987, and (4) Fox, Weatherly, and Strickland were responsible for reclassifying his job.
 
 
 8
 Baker settled all claims against Alberty. The remaining claims were presented to a jury which found that Fox retaliated against Baker by recommending that Weatherly be the acting Director of Finance, that no retaliation was involved in the selection of Weatherly rather than Baker as Director of Finance in 1984, that Weatherly retaliated against Baker by lowering his job performance evaluation in 1985, and that Fox, Weatherly, and Strickland retaliated against Baker by reclassifying his job position in January 1985.
 
 II.
 
 9
 The County and the individual defendants argue that this court should reverse the decision below because there is insufficient evidence to show that protected speech was the motivating factor in any adverse employment decision. In response, Baker claims that the defendants waived their argument regarding the sufficiency of the evidence by failing to properly raise it below.
 
 
 10
 Perhaps the sufficiency of the evidence argument could have been raised more clearly below in the motions for directed verdict and judgment n.o.v. However, we find that the defendants' Rule 50(a) motion for a directed verdict alerted the district court to this issue and that the defendants sought to renew this argument in the motion for judgment n.o.v. The cases cited by Baker in which the court refused to review an issue because it was not presented in a motion for a directed verdict at the close of the evidence can all be distinguished because, in this case, the court below was adequately informed at the close of all of the evidence of the nature of the defendants' contention that there was a deficiency in the evidence.[2]
 
 III.
 
 11
 We agree with the defendants that there is insufficient evidence in the record to support the verdict. In Whalen v. Roanoke County Board of Supervisors, 797 F.2d 170 (4th Cir.1986) (en banc), this court held that an issue must be supported by evidence which shows a "probability" of proof rather than a mere "possibility" before it properly can be submitted to a jury. Baker failed to make that showing in this case.
 
 
 12
 The first question submitted to the jury was whether the selection of Weatherly to be the acting Director of Finance rather than Baker violated Baker's first amendment rights. At trial, Baker claimed that Fox retaliated against him by recommending Weatherly to the Board of County Commissioners for the position of acting Finance Director. Fox testified that he recommended Weatherly because for the previous year and a half, Fox had had an opportunity to work with Weatherly. According to Fox, since the 1982 reorganization, Weatherly was essentially second in command and acted in Alberty's stead.
 
 
 13
 After reviewing the record, we find that there is insufficient evidence of retaliation. Weatherly was a logical choice to fill the position of acting Finance Director, and there is no evidence showing that Fox had any reason to retaliate against Baker. There is no evidence that Alberty and Fox were close friends or that Fox would wish to retaliate against Baker for any other reason for remarks made against Alberty. In fact, Fox eventually fired Alberty for reasons totally unrelated to Baker's allegations. We thus find that there is insufficient evidence to prove that Fox chose Weatherly in retaliation against Baker for making statements protected by the first amendment.
 
 
 14
 The next question presented to the jury was whether Weatherly retaliated against Baker by lowering his performance ratings in 1985. Baker argues that Weatherly lowered his performance ratings because he told Fox and Gilchrist that Alberty was misusing County funds. Again, we find that there is insufficient evidence to support a verdict against the defendant, Weatherly.
 
 
 15
 First, there is little, if any, evidence showing that Weatherly knew about Baker's statements to Fox and Gilchrist in 1982 and 1983. Weatherly testified that he had no knowledge of Baker's reports. Baker has shown no evidence that anyone told Weatherly about the reports or that Weatherly ever mentioned the meetings. Rather, Baker claims that Weatherly overheard Baker's remark to Fox at the 1983 departmental meeting that he had gone to the District Attorney. This is not evidence showing a probability of proof.
 
 
 16
 In addition, there is no evidence to show that Weatherly had a reason to retaliate against Baker for making remarks against Alberty. It seems obvious that Weatherly's motive for criticizing Baker's performance, if any, was not any statement made against Alberty, but rather Baker's complaints about the reorganization of the department in which Alberty promoted Weatherly. Baker's protest against the reorganization is not protected speech under the first amendment and cannot be a basis for the jury verdict.
 
 
 17
 Finally, the jury was asked whether Weatherly, Strickland, or Fox reclassified Baker's job to retaliate against him for his statements about the misuse of County funds by Alberty. Again, there is scant, if any, evidence supporting a verdict against the defendants on this claim.
 
 
 18
 In 1985, the County Personnel Department conducted an evaluation of Finance Department jobs. It was a routine practice for the classification and compensation division (the "division") of the County Personnel Department to evaluate job positions at the request of a department every time changes were made in employee positions or department operations. Alberty requested the study after he reorganized the Finance Department.
 
 
 19
 A member of the division explained that the reclassification was based upon information provided by the employees and their supervisors about their responsibilities. The division does not promote or demote employees. Rather, the division studies questionnaires that are completed by the employees, and gives the job position a score according to factors such as the degree of responsibility and difficulty of the job, etc. The score places the job within the County's pay plan. Based upon this study, the division determines whether the position needs to be retitled.
 
 
 20
 Baker's job reclassification was based upon information provided by Baker about his responsibilities in 1984. Because of a reduction in his duties, the division recommended a reclassification of his job and a freeze on his pay potential. His salary was not reduced. As a matter of routine practice, Strickland and Fox approved the reclassification. However, they were not involved in the decision to conduct the study or the decision to reclassify Baker's position.
 
 
 21
 Just as there is insufficient evidence to show that Weatherly retaliated against Baker because of Baker's statements to Fox and Gilchrist by lowering Baker's performance ratings, there is also insufficient evidence to show that Weatherly retaliated against him by reclassifying his job. Alberty asked the classification division to study the Finance Department after he reorganized the department. The division recommended the change in Baker's title and salary potential based upon information supplied by Baker in 1984. While Weatherly may have been partially responsible for the fact that Baker had fewer responsibilities in 1984 than he had prior to that time, the evidence does not show a probability that Weatherly reduced Baker's responsibilities because of Baker's statements about Alberty. Again, the record shows little, if any, evidence that Weatherly knew about Baker's conversations with Fox and Gilchrist, and even less evidence that Weatherly was motivated to make any employment decision based upon those statements.
 
 
 22
 There is also no evidence showing that Strickland knew about Baker's reports or was motivated to retaliate against Baker. Strickland testified that he was unaware of Baker's statements to Fox and the District Attorney until after Baker filed this lawsuit. Fox testified that he never revealed any of the Alberty information to Strickland. Baker provided no evidence that anyone ever told Strickland about his allegations against Alberty. As evidence of Strickland's knowledge of the reports, Baker points to the testimony of employee Patricia Grigg who testified that she overheard Strickland remark to County employee Alan McBrayer:
 
 
 23
 I'm sorry I had to be so hard on you.... Did you see me set him up? I set him up like a clay pigeon....
 
 
 24
 The statement was made after a meeting called to determine whether or not an employee, Ana Dixon, should be disciplined for writing a check without prior approval. Grigg believed that Strickland was telling McBrayer that Strickland had "set up" Baker.
 
 
 25
 McBrayer and Strickland, however, testified that Strickland was not talking about Baker, but about McBrayer. According to McBrayer, Strickland told him that he had asked McBrayer some pretty rough questions in the disciplinary meeting. Strickland's questions had forced McBrayer to take a viewpoint directly opposed to Baker's opinion. Baker was McBrayer's immediate superior at the time. Strickland indicated that he hoped that he had not set up McBrayer for retaliation by Baker.
 
 
 26
 Grigg's testimony is hardly evidence of a "probability" that Strickland knew about Baker's reports to Fox and Gilchrist or that Strickland retaliated against Baker because of those reports. This is only speculation by an employee who overheard a vague remark about what that remark meant. Furthermore, in addition to the absence of evidence of Strickland's knowledge of Baker's complaints about Alberty, we note the fact that the reclassification of Baker's job occurred in 1985, over two and a half years after Baker's meetings with Fox and Gilchrist. We also note that Strickland did not initiate the job evaluation or participate in the decision to reclassify Baker's job. Strickland merely approved a recommendation by the classification and compensation division.
 
 
 27
 There is also insufficient evidence that Fox retaliated against Baker. Fox, of course, knew about Baker's accusations. However, there is no evidence that Fox wanted to demote Baker because of his allegations. Like Strickland, Fox merely signed a decision made by another group of employees to reclassify Baker's position.
 
 IV.
 
 28
 The County also argues that Baker's statements about Alberty's alleged misuse of County funds were not a matter of public concern because Baker was acting in his own private interest. Because we find that there was insufficient evidence showing a causal connection between the statements and the alleged employment decisions, we need not reach this issue.
 
 V.
 
 29
 Having searched the record for evidence to support the jury verdict but having failed to find it, we reverse the district court's order awarding judgment for Baker.
 
 
 30
 REVERSED.
 
 HALL, Circuit Judge, dissenting:
 
 31
 I would not disturb the jury verdict in this case.
 
 
 32
 If this court sat as a de novo trier of facts, and I were called upon to draw the most reasonable inference from direct evidence in the cold record, I would perhaps agree with the version concluded upon by the majority. Nonetheless, the appellate perch is a much more difficult place to find facts than is a jury box. Consequently, we are not assigned the arduous duty to conduct a quest for the ultimate truth in every case; when our limited examination discovers controverted evidence which reasonable minds may interpret differently, our inquiry is at an end.
 
 
 33
 From 1982 until the filing of this case Baker's status, responsibility, and treatment at work steadily and inexorably declined. Fox's admonitions about news leaks when Alberty resigned certainly tend to show that employee whistleblowing was discouraged; by the timing of the remarks, they show that Fox attributed Alberty's downfall, at least in part, to such whistleblowing. Strickland's "clay pigeon" comment can be reasonably read as evidence of deliberate intent to discriminate against Baker.
 
 
 34
 The district court concluded that there was sufficient evidence to put all inferences necessary to Baker's case within the verdict. Though, as my colleagues' majority opinion shows, other reasonable minds might have reached a contrary result, there was sufficient evidence to support the judgment.
 
 
 35
 I respectfully dissent.*
 
 
 
 [1]
 In May 1984 Weatherly was selected to be the permanent Finance Director
 
 
 [2]
 Baker cites Kinzenbaw v. Deere & Co., 741 F.2d 383, 387 (Fed.Cir.1984), cert. denied, 470 U.S. 1004 (1985); Litman v. Mass Mutual, 739 F.2d 1549, 1556-57 (11th Cir.1984); Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565 (Fed.Cir.1986); Walters v. City of Atlanta, 803 F.2d 1135, 1146 (11th Cir.1986); Hughes v. Halifax County School Bd., 855 F.2d 183 (4th Cir.1988), cert. denied, 109 S.Ct. 867 (1989); and Federal Sav. & Loan Ins. Corp. v. Reeves, 816 F.2d 130, 137-38 (4th Cir.1987). In Kinzenbaw, Litman, Orthokinetics and Walters, the appellant failed to raise the contested issue in a motion for a directed verdict after the close of the evidence. In Litman, the defendant raised his argument in a motion for directed verdict after the plaintiff's case, however, the appellant did not reassert his argument at the close of all of the evidence. Furthermore, in response to the motion at the close of plaintiff's evidence, the trial court determined that the issue had not been preserved for trial. In the Fourth Circuit cases, Hughes, Reeves, and Miller, this court did not refuse to review the contested issues
 
 
 *
 Because of its disposition of this appeal, the majority declines to address what the parties treated as the focal issue--whether Baker's statements involved "matters of public concern." See Connick v. Myers, 461 U.S. 138 (1983). They plainly do. The public should be as vitally concerned with allegations of financial improprieties by those entrusted with public funds as is a farmer whose henhouse is guarded by the proverbial fox